**HENDERSON, Adm'r, Office of Price Administration, v. GLOSSER et al.**

**Civil Action No. 2046.**

District Court, W. D. Pennsylvania.

July 30, 1942.

See, also, 46 F.Supp. 458.

Lawrason Driscoll and Brunson Mac-Chesney, both of Washington, D.C., for plaintiff.

Elvin Teitelbaum, of Johnstown, Pa. for Glosser & Sons, defendant.

Elder W. Marshall, John C. Bane, Jr., and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., for Jones & Laughlin Steel Corporation, for defendant.

SCHOONMAKER, District Judge.

This action brought under the provision of the Emergency Price Control Act of 1942, Public L. No. 421, 77th Congress, 2nd Session, C. 26, 50 U.S.C.A.Appendix, § 901 et seq., charges that defendants sold or bought iron or steel scrap at prices violating Revised Price Schedule No. 4-Iron and Steel Scrap (appearing 7 Fed. Reg. 1207), which establishes maximum prices for various grades of iron and steel scrap.

The plaintiff is seeking an injunction against defendants in accordance with Section 205(a) of said act, to enjoin them from any acts and practices which constitute a violation of any provision of Section 4 of said act, which makes it unlawful for any person to sell or deliver any commodity or to buy or receive any commodity in violation of price schedule effective under the provisions of Section 206 of the Act.

Consent decrees have been entered in this case as to defendants M. Glosser & Sons and Staiman Brothers, enjoining them from violating this Act. A default decree has been entered against the defendant F. Hodes Coal & Junk Company, enjoining that company from violating this Act.

The defendant Allegheny-Ludlum Steel Corporation has moved for summary judgment in its favor, under Rule 56 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, on the ground that the complaint states no cause of action against that company. That motion we are denying in accordance with an opinion filed herewith.

The case, as against the Jones & Laughlin Steel Corporation, was heard on complaint, answer and proofs. From these we find the facts, so far as concerns this corporation, to be briefly these:

Defendants M. Glosser & Sons are engaged in the business of buying and selling scrap iron and steel at Johnstown, Pa. The Jones & Laughlin Steel Corporation owns and operates a large steel-manufacturing plant in Pittsburgh, using in the course of its business about fifteen thousand tons of scrap iron and steel per month. On or about January 26, 1942, it placed a written purchase order with defendants M. Glosser & Sons for seven hundred and eighty tons of heavy melting steel scrap to be shipped as soon as possible. The same day it entered into an agreement with M. Glosser & Sons to sell to that firm a battery of two hydraulic presses then located at one of its plants at a price of eight cents per pound, or approximately $16,800. It was agreed that the purchase price was to be paid in number-one heavy melting scrap at a base price of $20 per ton. These presses have not yet been delivered by Jones & Laughlin Steel Corporation to M. Glosser & Sons. Some forty-seven cars of scrap were shipped under this agreement. Among them were two cars involved in this suit, i.e., P&LE Car 46905 and B&O Car 259038, which were invoiced as heavy melting steel at the rate of $20 per ton. The contents of these cars did not come up to specification of number-one heavy melting steel, but were un-

462

loaded by the Jones & Laughlin Steel Corporation, and used by it in its furnaces. Within a week after the delivery of these two cars, J. W. Miller, scrap buyer for the Jones & Laughlin Steel Corporation, notified said M. Glosser & Sons by telephone of the defective quality of the contents of these two cars, and stated that the Company would not pay $20 per ton for them. The price to be paid for these two cars has not yet been agreed upon. By letter of June 23, 1942, from the Jones & Laughlin Steel Corporation to M. Glosser & Sons, that firm was credited with $17,148.51. But the letter stated that the Jones & Laughlin Steel Corporation would withhold $1,111.55 for the purpose of adjusting claims on account of off-grade material. On the witness stand, David Glosser stated his firm would be obliged to accept such adjustment.

Under those circumstances, we cannot find that the Jones & Laughlin Steel Corporation has paid or bound itself to pay the $20 per ton for the off-grade steel scrap contained in these two cars. Its conduct in connection with these two cars of off-grade scrap is fully justified by Section 69 of the Pennsylvania Sales Act of May 19, 1915, P.L. 543, 69 P.S. § 314, which provides:

"First. Where there is a breach of warranty by seller, the buyer may, at his election,—

"(a) accept or keep the goods and set up against the seller the breach of warranty by way of recoupment in diminution or extinction of the price;"

We cannot see that by accepting and using this scrap, the Jones & Laughlin Steel Corporation committed any act that would infringe the price regulation, as long as it did not pay therefor a price higher than that fixed by the Regulation. That it has not done.

Findings of fact and conclusions of law in accordance with this opinion are filed herewith.

The complaint will be dismissed as to the Jones & Laughlin Steel Corporation. A decree may be submitted accordingly on notice to opposing counsel.

Findings of Fact and Conclusions of Law with Respect to the Trial of Above Action as to Defendant Jones & Laughlin Steel Corporation

This case was heard, so far as concerns Jones & Laughlin Steel Corporation, on complaint, answer, and proofs. From these we make the following findings of fact and conclusions of Law:

Findings of Fact

1. The plaintiff Leon Henderson is Administrator of the Office of Price Administration, and in that capacity brings this action under Section 4(a) of the Emergency Price Control Act of 1942, Public Laws 1942, 77th Congress, Second Session, c. 26, 50 U.S.C.A.Appendix, § 904(a); and Revised Price Schedule No. 4, specifying maximum prices for iron and steel scrap (7 Federal Register, page 1207).

2. Defendants David Glosser, Solomon Glosser, Moses Glosser and William Glosser have been engaged for some years as partners, in the business of buying and selling scrap iron and steel, both as principals and as brokers, in Johnstown, Cambria County, Pennsylvania, under the firm name of M. Glosser & Sons.

3. Defendant Jones & Laughlin Steel Corporation is a Pennsylvania corporation which has for years owned and operated a large steel-manufacturing plant in the City of Pittsburgh, Allegheny County, Pennsylvania, the equipment of which includes a number of blast furnaces and open hearth furnaces.

4. Scrap iron and steel are essential raw materials to the proper operation of blast furnace and open hearth furnaces in steel plants. During the years 1941 and 1942, the operations of the plant of the Jones & Laughlin Corporation (like those of all other steel companies) have been greatly increased to meet the enlarged demand for steel products created by the current World War. During the past months of the year 1942, the Jones & Laughlin Corporation has bought and used scrap iron and steel in its Pittsburgh plant at the rate of approximately 15,000 tons per calendar month.

5. The Jones & Laughlin Corporation has purchased its scrap iron and steel during recent months through a large number of brokers, among them the firm of M. Glosser & Sons. For months past, and at least since the beginning of 1942, the demand for scrap iron and steel has largely exceeded the supply, and the scrap brokers and dealers have rarely, if ever, maintained any stock of scrap on hand from which to make deliveries. Instead, the Jones & Laughlin Corporation and other purchasers

of scrap have placed orders with the brokers for future deliveries, during periods of sixty to ninety days. The brokers have then, as far as possible, obtained the scrap required to fill such orders, and made deliveries thereof as they had been able to obtain the necessary scrap. The rate of operations and the consumption of scrap iron and steel at the Pittsburgh plant of the Jones & Laughlin Corporation have proceeded at such a rate during 1942, that it has customarily transferred scrap iron and steel directly from the railroad cars in which it is delivered, into the furnaces, without unloading it into any scrap yard.

6. On or about January 26, 1942, the Jones & Laughlin Corporation delivered its written purchase order No. 98885 to M. Glosser & Sons, by which it ordered 780 tons of heavy melting steel scrap to be shipped "as soon as possible". On the same day, the Jones & Laughlin Corporation entered into an agreement with M. Glosser & Sons, the terms of which were stated in a letter addressed to M. Glosser & Sons by the Jones & Laughlin Corporation and dated January 26, 1942. This agreement was supplemented or modified by a letter addressed to M. Glosser & Sons by the Jones & Laughlin Corporation on May 19, 1942. Under this agreement, M. Glosser & Sons agreed to purchase a battery of two hydraulic presses, then located at one of the plants of the Jones & Laughlin Corporation, at a price of eight cents per pound, or approximately $16,800. It was agreed that the purchase price should not be paid in cash, but that the Glosser firm should instead deliver to the Jones & Laughlin Corporation sufficient number-one heavy melting scrap at the base price of twenty dollars per ton to balance the account, so that no payment of cash should be involved. It was also agreed that the two presses should be retained in the possession of the Jones & Laughlin Corporation and not delivered to the Glosser firm until the required deliveries of scrap should be completed. The supplemental letter of May 19, 1942, shows the Glosser firm desired to obtain shipment of at least one of the two hydraulic presses. Neither press had been delivered or removed from the possession of the Jones & Laughlin Corporation at the time this case was tried. In the meantime, the Glosser firm had shipped to the Jones & Laughlin Corporation at least forty-seven carloads of scrap, which it appropriated to Order No.

98885. These shipments began on or about February 23, 1942, and ended on about April 20, 1942.

7. Among the forty-seven cars of scrap shipped to the Jones & Laughlin Corporation by the Glosser firm under order No. 98885 were two carloads particularly involved in this case. These were P&LE Car 46905 and B&O Car 259038, both consigned to the Jones & Laughlin Corporation's Pittsburgh Works by the Glosser firm at Johnstown on March 11, 1942. On the same day, the Glosser firm forwarded to the Jones & Laughlin Corporation an invoice in which it described the contents of Car B&O 259038 as 48,320 pounds of heavy melting steel, and in which it charged the Jones & Laughlin Corporation therefor at the rate of twenty dollars per ton; and a similar invoice in which it described the contents of P&LE Car 46905 as 48,700 pounds of heavy melting steel, and charged the Jones & Laughlin Corporation therefor at the base price of twenty dollars per ton.

8. On March 13, 1942, Messrs. Irving R. Segal and Myron Caffee, the former an attorney and both then employed as investigators by the plaintiff in this case, called at the offices and the Pittsburgh plant of the Jones & Laughlin Corporation, and made inquiries of several officers of the Corporation concerning the precise nature of the contents of the two cars of scrap aforesaid, which had been shipped from Johnstown on March 11, 1942. At some earlier time, Messrs. Segal and Caffee had made other investigations of the origin and nature of a number of shipments of scrap iron and steel, including in particular the scrap contained in these two cars, and they were fully informed on March 13, 1942, upon these matters. Neither of the two cars was delivered to the Jones & Laughlin Corporation until after March 13, 1942; and on March 13, 1942, no representative of the Jones & Laughlin Corporation can have had any knowledge of the quality of the scrap contained in either of the two cars. However, at the request of Mr. Segal, the representative of the Jones & Laughlin Corporation agreed that Mr. L. A. Lambing, superintendent of the open hearth and Bessemer furnaces at the Pittsburgh plant, should, upon the delivery of the two cars, make a written report to Mr. Segal, describing their contents and stating the disposition made thereof by the Jones & Laughlin Corporation.

9. On or about March 17, 1942, P&LE Car 46905 was delivered to the Jones & Laughlin Corporation at its Pittsburgh plant. Mr. Lambing, carrying out the arrrangement made with Mr. Segal, addressed a letter to Mr. Segal in which he reported, as were the facts, that the car contained bales of sheet steel and tin cans; that the tin had not been removed from some of the tin cans; that the matter had been reported to Mr. Miller, the agent of the Jones & Laughlin Corporation in charge of scrap purchases, with a complaint from Mr. Lambing; but that, because of a shortage of scrap, the contents of the car were being charged in small doses into the furnaces.

10. Such scrap as that contained in P&LE Car 46905 was not "heavy melting steel", as that grade of scrap is defined in Price Schedule No. 4. It was instead, "No. 3 Bundles". Such bundles or bales of tin cans and automobile sheet steel are acceptable for use in open hearth furnaces; and command a base price of twenty dollars per ton, equal to that of heavy melting steel, under Price Schedule No. 4, unless (as was the case here) the tin cans have not been perfectly detinned. In that event, the maximum base price must be reduced to $15 or to $12, per ton. In this case, the tin content of the bundles was such as permitted payment of a base price of $15 per ton.

11. Neither Mr. Segal nor any other representative of the Office of Price Administration ever made any reply to Mr. Lambing's letter of March 17, 1942. However, on April 2, 1942, Mr. Segal addressed a telegram to Mr. Lambing, asking for a report concerning the contents of B&O Car 259038. On April 3, 1942, Mr. Miller, the scrap purchasing agent of the Jones & Laughlin Corporation, (to whom the telegram had been referred by Mr. Lambing) addressed a telegram to Mr. Segal, stating that the contents of the B&O Car were of the same quality as those of P&LE Car 46905. On April 6, 1942, Mr. Ochsenhirt, Purchasing Agent of the Jones & Laughlin Corporation, supplemented this report with a letter, confirming it and soliciting Mr. Segal's assistance in the matter. Neither Mr. Segal nor any other representative of the plaintiff made any reply to this letter, or any further communication to the Jones & Laughlin Corporation concerning the two cars of scrap. Approximately one month later, on or about April 21, 1942, Mr. Parrish, then employed as an investigator by the plaintiff, interviewed defendant David Glosser at Johnstown for the purpose of ascertaining, among other things, whether the Jones & Laughlin Corporation had paid for the two cars of scrap, and was advised by Mr. Glosser that no payment had been made for either car.

12. In the meantime, as had been suggested in Mr. Lambing's report, the Jones & Laughlin Corporation had used the contents of both cars in the furnaces at its Pittsburgh plant. Afterwards, within not more than a week after the delivery of the cars, Mr. Miller informed David Glosser by telephone of the defective quality of the contents of the two cars, and stated that the Jones & Laughlin Corporation would not pay $20 per ton for them.

13. It does not appear that any adjustment of the price of the scrap contained in the two cars aforesaid was agreed upon at any time prior to the trial of this case between the Jones & Laughlin Corporation and the Glosser firm. On June 23, 1942, (somewhat more than a month after this suit was commenced) the Jones & Laughlin Corporation addressed a letter to the Glosser firm, (by which it agreed that the aggregate net-invoice price of thirty-nine carloads of scrap which had been delivered to the Jones & Laughlin Corporation by the Glosser firm during the period between February 21, 1942, and April 3, 1942, was $17,148.51, "representing the value of the press, as nearly as can be approximated through assembly of invoices" (this referred to the price of the hydraulic presses described in the agreement of January 26, 1942, at eight cents per pound); and in which it stated that these invoices should be cancelled as payment of the purchase price of the hydraulic presses; but that the Jones & Laughlin Corporation should withhold, "for the purpose of adjusting claims account of off-grade material, the net amount represented" by three other invoices, aggregating the sum of $1,111.55. Although the invoice for B&O Car 259-038 was one of the thirty-nine cancelled in this letter, the purpose for which the Jones & Laughlin Corporation withheld this $1,111.55 was to enable it to force, by recoupment or setoff, such reduction of the original invoice-prices of the two carloads of scrap involved in this case, as should be required by the Emergency Price

Control Act and the provisions of Revised Price Schedule No. 4. In other words, by withholding payment of the $1,111.55 in its letter of June 23, 1942, the Jones & Laughlin Corporation intended to re-assert to the Glosser firm its intention and purpose not to pay the invoice price of $20.00 per ton for the scrap contained in the two cars aforesaid, and to pay instead only such lower price as should be permissible under the law. The Glosser firm had theretofore acquiesced in this position, and when David Glosser appeared as a witness for the plaintiff at the trial of this case, he stated that his firm would be obliged to accept any such adjustment. The said sum of $1,111.55 so withheld has never been paid.

14. When it accepted and used the scrap contained in the two cars, in spite of its inferiority to the grade of scrap described in the invoices, and without first communicating its complaint to the Glosser firm, the Jones & Laughlin Corporation followed a practice which has not been uncommon during the year 1942, under like circumstances at its plant, and at the plants of other steel companies such as the Bethlehem Steel Corporation. In its determination to withhold payment of a sufficient portion of the invoice-price to force an adjustment by the Glosser firm, the Jones & Laughlin Corporation conformed to a practice which is permitted by law (See Sales Act of May 19, 1915, P.L. 543, Section 69, 69 P.S. § 314). By appearing in the transaction as a broker (and not as a principal) and claiming the broker's commission of 50¢ per ton in its invoices for the two cars, the Glosser firm guaranteed the quality of the scrap contained in the two cars (see Section 1034.6 of Revised Price Schedule No. 4; 7 Federal Register 1207).

15. In its acceptance and use of the two carloads of scrap, and its dealings with the Glosser firm with regard thereto, the Jones & Laughlin Corporation intended at all times to avoid any violation of the Emergency Price Control Act; and there is nothing in the evidence which can justify the conclusion that an injunction against the Jones & Laughlin Corporation is necessary either to correct or punish any past violation or to prevent any future violation of the law.

## Conclusions of Law

(1) This court has jurisdiction of this proceeding under the provisions of the Emergency Price Control Act of 1942.

(2) Under the provisions of Revised Price Schedule No. 4 which were in effect throughout the month of March, 1942, (7 Federal Register 1206) the maximum base price payable in Pittsburgh for scrap iron and steel of the quality contained in Cars P&LE 46905 and B&O 259038 was $15 per ton.

(3) Under the provisions of Revised Price Schedule No. 4, which were in effect throughout the month of March, 1942, defendants M. Glosser & Sons, as brokers, guaranteed the quality of the scrap delivered by them to the Jones & Laughlin Corporation in cars P&LE 46905 and B&O 259038 to be of the quality of that designated on the accompanying invoices, towit: heavy melting steel scrap.

(4) Upon delivery to it of the two carloads of scrap of a quality less than that so guaranteed to it as aforesaid, the defendant Jones & Laughlin Corporation had the lawful right to accept, keep and use the scrap, and at any time thereafter to set off in any accounting between it and the defendants M. Glosser & Sons, in diminution of the purchase price, such sum (in this instance the sum of $5.00 per ton) as was necessary to reduce the invoice price of the scrap aforesaid to the maximum lawful price thereof.

(5) The defendant Jones & Laughlin Corporation has not thus far paid any portion of the purchase price of the two carloads of scrap aforesaid.

(6) The defendant Jones & Laughlin Corporation has not bought, offered to buy, or accepted delivery of, the iron and steel scrap contained in the cars aforesaid at prices higher than the maximum prices permitted under Revised Price Schedule No. 4; and with respect to said scrap it has committed no violation of the Emergency Price Control Act or of Revised Price Schedule No. 4.

(7) No injunction should be awarded against the defendant Jones & Laughlin Corporation, and as to it this suit should be dismissed.